WIRGMAN's Adm'rs vs. MACTIER.—*December*, 1829.

THE owner of a ship after she was laden at *Baltimore*, on the 14th May, 1810, agreed with the shippers of the cargo, in writing, that their goods were "to be landed in a permitted port on the continent of *Europe*, (meaning that they were not to be landed at the Island of *Sylt*) before the freight should be earned, *but should the whole of the continent be shut*, the freight, with an addition as arbitrators might determine, would be earned, should the property be landed in *England*, agreeably to the custom of the country." On the 25th April, 1810, a charter party had been entered into for the same ship, by which the owner covenanted to proceed with his ship from *Baltimore*, north about, for the Island of *Sylt*, thence to *Hamburg* or *Bremen*, if open to American ships, if not, the cargo to be landed at *Sylt* if permitted, and in case of refusal there, thence to such permitted port in the *North Sea* or *Baltic*, as the master and supercargo might direct; and should the *Baltic* be closed against the admission of *American* vessels, then to such other port as the master and supercargo might again direct. The freight was to be paid agreeably to the bills of lading, *provided* the cargo was discharged at a port in the *North Sea*; but if delivered at any port in the *Baltic*, an advance in the freight was covenanted for; and should the *Baltic* be shut, a further advance in the freight to be settled by arbitration. On the 8th May, 1810, a bill of lading was also signed for the plaintiff's goods, which stated the ship to be bound from *Baltimore* for *Sylt*, and a permitted port in the *North Sea* or *Baltic*, the goods to be delivered at the aforesaid permitted port, unto *P* of *Hamburg*, who was not the supercargo of the ship. In an action where the plaintiff claimed under these contracts, he offered testimony to establish that certain ports in *Europe*, not on the *North Sea* or *Baltic*, were open to *American* vessels, but the court held that looking to the historical facts and occurrences of the time, it was manifest that the voyage was undertaken, and the charter party, bill of lading, and agreement entered into, with a view to the then political state of affairs in *Europe*, and should be construed with a view thereto— that the permitted port on the continent of *Europe*, in which, the goods were by the agreement to be landed, before freight could be earned, was intended to be a permitted port in the *North Sea* or the *Baltic*; and also that all the said instruments must be construed in connexion with each other, and the general terms in the agreement of the 14th May, restricted to the *North Sea* and *Baltic*; and therefore rejected the testimony offered, as inadmissible and irrelevant.

Whether ship owners are entitled in equity and good conscience, to retain money received on account of freight, is clearly a question not to be left to the jury; but proper only to be decided by the court, under the circumstances of each case.

o

So where in an action of *assumpsit* brought by the owner of merchandize shipped in the defendant's vessel, to recover a sum which the defendant had received and retained for freight, it appeared that the shipment was made under the charter party, bill of lading, and agreement above referred to, and that the master was furnished with instructions from the plaintiff, as follows, "on account of the unsettled state of affairs on the continent of *Europe*, I have thought proper to request my friends Messrs. *P. & Co.* of *Hamburg*, in the event of the cargo of the ship being denied entry at their port, to consult with you on the further destination of the ship, and the disposal of my interest on board. In case they have no friend at the port she may proceed for, you will please take charge of it, and advise with them what is best to be done for my interest. On your arrival off *Sylt*, should the situation of affairs be such as to prevent you from communicating with Messrs. *P. & Co.*, in that case you will have to proceed with the cargo where you judge it will be most advantageous for all concerned, when I shall consider my part as entirely under your charge, &c." The ship sailed on her voyage, was captured before her arrival off *Sylt*, taken into a port in *Norway*, but ultimately released. The master, after the restoration of his ship and cargo, without consulting with the consignees about the further destination of the ship, or disposition of the plaintiff's property, although he had the means of communicating with them, proceeded with his ship to *England*, there delivered his cargo, and received (from the agents who sold the cargo,) as freight, the sum claimed in this action. HELD, he was not entitled to retain it.

Where by the municipal regulations of certain ports, a certificate of origin was necessary to the admission of certain merchandize there, a shipmaster having received such goods on board his ship, and signed a bill of lading for their delivery at one of such ports, cannot in the absence of evidence to shew it was the duty of the shipper to furnish such a certificate, set up the fact of that document not being on board his ship, as an excuse for not entering the port at which he had agreed to land the property entrusted to him; nor as a justification for his delivering it at another port, and thereby earn freight.

APPEAL from *Baltimore* County Court. This is the same case which was before this court at December Term, 1819, (4 *Harr. & Johns.* 558,) on appeal from *Baltimore* county, wherein the Judgment was reversed, and the record remitted under a *procedendo*.

1. At the second trial, the same evidence was offered as on the first trial, and which is set out in the bill of exceptions then taken, [see 4 *Harr. & Johns.* 568] except that stated in page 574, lines 5, 6, 7, 8 and 9, from the bottom, as to the under-

standing of the merchants of *Baltimore*, &c.   Also that of *H. Campbell*, in page 575, lines 5, &c. and substituting that of *James Dooley* as hereafter mentioned.   Also omitting in page 575, lines 3, 4, 5, 6 and 7 from the bottom.   The defendants in order to prove that *Peter Wirgman* was ordered to leave *Denmark* by the Collector of the Customs at *Flekkefiord* without delay, read in evidence the deposition of *James Dooley*, taken by consent. He deposed " that he was the second officer on board the ship *William Wilson, Peter Wirgman*, commander, on a voyage to *Europe*, in the year 1810.   In the month of October or November of the same year, while the said ship was lying at *Flekkefiord*, in *Norway*, and before the Admiralty proceedings against said ship were terminated, the deponent was present at conversations between *E. Thomman*, supercargo of said ship, and said *Peter Wirgman*, in which the said *Thomman* united with the said *Wirgman* in determining that in the event of the liberation of said ship and cargo, they would proceed with the same to the port of *Hull*, in *England*.   That subsequent to the above conversation, and while the said ship lay at *Flekkefiord*, as aforesaid, the said *Thomman*, in the absence of Captain *Wirgman*, asked this deponent, and *Walter Pratt*, first officer of said ship, what time it would require to get said ship in readiness for sea; and then declared his determination to proceed with said ship and cargo, in the event of their liberation, to *Hull*, as aforesaid.   That a day or two afterwards the said *Thomman* left *Flekkefiord* and proceeded, as this deponent understood, to *Christiansand*, and this deponent did not see him afterwards.   This deponent further saith, that sometime in the latter end of November, the said ship left *Flekkefiord*, and dropt down to the *Albernes*, and remained there until about the 10th day of December, when Captain *Wirgman* came on board from *Flekkefiord*, accompanied by a pilot, who ordered the ship to be got under weigh; and declared, in answer to a question put to him by this deponent, why he meant to proceed with the ship to sea that night, that he had received an order to that effect from inspector *Lassen*, who was the Collector or Custom-house Officer at *Flekkefiord*.   This deponent further saith, that two or three

days before the said ship proceeded to sea, the said *Wirgman* sent an express to *Fahareund*, to hurry the said *Thomman* on to *Albernes*, to join the said ship. That the said *Peter Wirgman* expressed an anxiety that the said *Thomman* should arrive at *Albernes* before the said ship proceeded to sea. That after the said ship had got down to the harbours mouth, the night being very tempestuous and stormy, Captain *Wirgman* prevailed upon the pilot to return with said ship to her former anchorage, alleging the weather as an excuse, but in reality, as this deponent understood, to afford further time for the said *Thomman* to join the ship; but that the said ship, after getting within a quarter of a mile of her former anchorage, was struck aback and compelled to proceed to sea; that the said ship proceeded to *Hull*, and that on her passage, this deponent heard Captain *Wirgman* frequently express a wish that said *Thomman* had joined the said ship at *Albernes*, as the said *Thomman* had promised."

The defendants further offered evidence that the cargo of the plaintiff was colonial produce ; and to prove that no American vessel, laden with colonial produce, would have been permitted at the time the said ship *William Wilson* left *Norway*, as aforesaid, to land the said produce in any port in the *Baltic* or *North Sea*, unless the cargo of such vessel was accompanied by proper certificates, shewing the origin thereof, and that the same was not the produce of *Great Britain*, or any of her colonies, read in evidence, by consent of the plaintiff, from the *British Register*, the *American Register*, the *American state papers*, and the *Federal Gazette* newspaper, published in *Baltimore*, in the year 1810, certain orders, decrees and municipal regulations of *France, Denmark, Prussia, Russia, Austria* and *Sweden*, which it was agreed shall be read in the argument of this cause before the Court of Appeals. The defendants also offered in evidence, that *Wirgman*, after he left *Flekkefiord*, as aforesaid, was without further means, or opportunity of communicating with the said *Parish & Co.* until his arrival at *Hull*, as aforesaid.

The plaintiff then offered to prove by *John Donnell*, a witness, sworn at the bar, that a certain ship or vessel, called the

*Eleanor*, belonging to the said *Donnell*, with a cargo consisting of colonial produce, had sailed from *Baltimore*, in the year 1810, and proceeded to *Constantinople*, a port on the continent of *Europe*, situate on the *Dardanelles*, where she had landed and delivered her cargo in safety, without any molestation by the government of that country ; and also offered in evidence by the same witness, that in the year 1810, a vessel belonging to him proceeded to the port of *Salonica*, on the continent of *Europe*, on the *Morea*, loaded with colonial produce; and also offered evidence that the port of *Gibraltar*, on the continent of *Europe*, was, in the year 1810, open to *American* ships, loaded with colonial produce.    To the admissibility of which evidence the defendants objected, because the said evidence had no relation to the matter in controversy in this suit, between the plaintiff and defendants; but the court [*Archer*, Ch. J. and *Hanson* and *Ward*, A. J.] overruled the said objection, and admitted the said evidence ; being of opinion and so directed the jury, that the contract of the said *Charles & Peter Wirgman* with the plaintiff, was not limited to the ports of the continent in the *North Sea* or *Baltic*, but extended to every port of the continent of *Europe* whatsoever.    To which opinion and direction and the admission of said evidence, the defendants excepted.

2. The defendants then moved the court to direct the jury, that if they shall believe that agreeably to the orders and decrees of *France, Prussia, Russia, Sweden, and Denmark*, as produced in evidence in this cause, all uncertificated colonial produce was prohibited from entry into the ports of those respective countries, and that the captain of the ship *William Wilson* was unprovided with a certificate of origin for that part of the cargo which belonged to the plaintiff, and which consisted of colonial produce; that then the captain was justified in not attempting to enter any of the ports of the countries before mentioned, to land the said cargo, and that in proceeding to *Hull* for that purpose he fulfiled the contract between the plaintiff and the ship owners, and entitled them to freight according to said contract, and consequently that the plaintiff cannot recover in this action.    Which direction the court refused to give.    The defendants excepted.

3. The defendants also moved the court to direct the jury, that if from a consideration of all the circumstances as given in evidence in this cause, they shall be of opinion, that the defendants are entitled in equity and good conscience, to retain the money by them received, that then the plaintiff is not entitled to recover on the first count of his declaration. Which direction the court refused to give. The defendants excepted.

4. The defendants further moved the court to direct the jury, that if they shall be of opinion that all the ports of the continent of *Europe*, on the *North Sea* and in the *Baltic*, were closed by municipal regulations against the admission of a vessel and cargo in the predicament of the *William Wilson* at the time of her liberation by the Court of Admiralty at *Christiansand*, and that in these circumstances, the *William Wilson* was expelled from the ports of *Norway* by the orders of the *Danish* government so suddenly as not to allow time for a further correspondence between *Peter Wirgman* and *David Parish & Co.* of *Hamburg*, that by these events, and by force of the letter of instructions from the plaintiff to *Peter Wirgman*, of the 8th day of May, 1810, the said *Wirgman* became the special agent of the plaintiff, and that being such special agent if he proceeded to *Hull* and then accepted that part of the cargo which belonged to the plaintiff in satisfaction of the contract, he the plaintiff is not entitled to recover in this action. Which direction the court refused to give. The defendants excepted; and the verdict and judgment being against them, they appealed to this court.

The cause was argued before BUCHANAN, Ch. J. and EARLE, MARTIN, STEPHEN and DORSEY, J.

*Meredith* for the appellants, contended: 1. On the *first* bill of exceptions, that the evidence offered by the appellee, was irrelevant and inadmissible; because, by the true construction of the contract, it looked for the destination of the cargo, to a permitted port in the *North Sea*, or *Baltic*, and not to a port, or ports on the continent, situated on any other sea.

2. That such being the true construction of the contract, and appellants having offered evidence, that agreeably to orders

and decrees of *France, Prussia, Russia, Sweden* and *Denmark,* all uncertificated colonial produce was prohibited from entry in the ports of those respective countries; and that the goods of the appellee, which consisted of colonial produce, were unaccompanied by a certificate of origin, the court erred in refusing to direct the jury, as stated in the second bill of exceptions, that if they believed said evidence, the captain was justified in not attempting to enter any of the ports of the countries before mentioned, to land the said cargo; and that in proceeding to *Hull,* for that purpose, he fulfilled the contract of affreightment; and entitled the owners to freight, and that consequently the appellee was not entitled to recover; because, by his own omission and negligence, he had prevented the appellants from proceeding to any of the said ports.

3. On the *third* bill of exceptions, that whatever may be the legal construction of the contract, this being an action for money had and received, the jury had a right to take into their consideration, all the equitable circumstances disclosed by the evidence, and to find a verdict for the appellants, if in their opinion, the appellants had a right in equity and good conscience to retain the money received as freight, even though, had it not been received, they would not have been entitled to recover it, in an action against the appellee, upon the contract of affreightment.

4. On the *fourth* bill of exceptions, that the court below erred in refusing the direction therein prayed; because, although the contract is admitted to extend to every part of the continent of *Europe* whatsoever, still *Peter Wirgman* having been constituted by the appellee, as his special agent, in a certain emergency, if the jury believed such emergency to have occurred in point of fact, then *Peter Wirgman,* as such special agent, had a right to alter the destination of the goods of the appellee, within the limits of the contract; and having actually done so by proceeding to *Hull,* and there accepting that part of the cargo which belonged to the appellee, he entitled the appellants to freight, and, therefore, prevented the appellee from recovering in this action.

1. On the *first* bill of exceptions. The question is, whether the charter party or the letter or agreement of the 14th of May, was the contract between the parties to this suit. A parol agreement inconsistent with one under seal, cannot be set up against the agreement under seal. 3 *Stark. Evid.* 1002. *White vs. Parkin,* 12 *East.* 578, 583. *Wood vs. Day,* 7 *Taunt.* 646, (2 *Serg. & Lowb.* 247.) *Abbott on Shipping,* 454. The agreement of the 14th of May, is repugnant to the charter party. The charter party stipulates, that the cargo might be landed at *Sylt;* and the agreement of the 14th of May, is, that the cargo should not be landed at *Sylt.* If the agreement of the 14th of May, did not control the charter party, was the construction given to that agreement, consistent with the charter party? *Com. on Cont.* 23, 24, 25, (*Ed.* 1824.) The contract originally stood alone on the bill of lading. The charter party, in fact, was not executed until the 14th of May. The ports in the *Baltic* and *North Seas* only were in the contemplation of the parties; no other construction can be given to their agreements. The construction of general expressions in agreement is to be restrained. 6 *Bac. Ab. tit. Statute,* 381. *Adams vs. Woods,* 2 *Cranch,* 341.

2. On the *second* bill of exceptions. It was the duty of the plaintiff below, to provide certificates of origin of his part of the cargo, required by the municipal regulations of the countries mentioned in this exception. He had covenanted by the charter party to do so.

3. On the *third* bill of exceptions. The *first* count in the declaration is for money had and received. It is an equitable count; and the defendants are entitled in equity and good conscience, to retain the money received by *P. Wirgman.* The plaintiff cannot go into the original liability of the party.

*Scott,* for the appellee, referred to the decision of this court on the former trial in this case, as reported in 4 *Harr. & Johns.* 568, and to the argument of the counsel as taken in manuscript, but not reported, to show that what has been relied on by the counsel for the appellants now, was not then insisted on. 1. On

the *first* bill of exceptions, he cited *Pow. on Cont.* 370, 371. 2. On the *second* bill of exceptions, he stated that more than fourteen years had elapsed between the transaction and the last trial, so. that it could not be proved whether or not the captain was furnished with the necessary certificates. The objection raised at the last trial, had not been urged at the former one, or the necessary proof might have been then procured. There was no evidence adduced that the vessel was prevented from entry into any of the ports, because of the want of the certificate. She had been captured, but was acquitted at one of the ports. 3. On the *third* bill of exceptions, he cited 2 *Com. on Cont.* part 3, Ch. 6, *Am. Reg.* 21.

*Taney* (Attorney General of Maryland) on the same side. 1. On the *first* bill of exceptions. This court in the former case, decided that the parties could make a contract different from the charter party, as to the separate property of any of the shippers. The charter party was a mere formal paper. It was not delivered, and no action could be supported on it. It was executed for no other purpose, but as necessary to make the ship's papers regular. - It cannot be the deed of the parties, unless it was intended as such. *Com. on Cont.* 25, 27, 28. *Moorson vs. Page,* 4 *Campb.* 103. 5 *Petersdorff,* 363, 367, 310, 372, 350, 351, 371. *Barker vs. Hodgson,* 3 *Maule & Selw,* 267. 2 *Barnw. & Ald.* 17. *Hadley vs. Clarke,* 8 *T. R.* 259. *Smith vs. Wilson,* 8 *East.* 437. *Touteng vs. Hubbard,* 3 *Bos. & Pull.* 295 (*note.*)

2. On the *second* bill of exceptions. The jury were not the judges of the written decrees of foreign countries. The construction of those decrees was for the court, and not for the jury. *Etting vs. Bank of United States,* 10 *Wheat.* 50. Did any of the decrees prevent the entry of the vessel, unless she had a certificate of the origin of the cargo? The captain was not bound to sail without the certificate, if it was necessary. Is it a paper of the cargo or of the vessel? *Abbott on Shipping,* 260, 261. Who was to prove that the certificate was on board of the vessel? If the captain was to prove that it was not on

board, then he did not prove that fact. It is to be presumed to have been on board of the vessel. It was not in the power of the plaintiff to prove that it was on board, as it was in the possession of the captain. The captain did not attempt to enter the port, but sets up an excuse for not attempting it. He was then bound to prove why he did not. *Van Omeron vs. Donrick,* 2 *Camb.* 42. *Tarleton vs. M'Gauley, Peakes N. P. Cas.* 205.

3. On the *third* bill of exceptions. The jury are not to decide what is equity and good conscience. *Hunter vs. Princep.* 10 *East.* 378.

4. On the *fourth* bill of exceptions. There is no legal evidence of the fact that the vessel was ordered away from *Flekkefiord.* It was only the declarations of the pilot, which are not evidence.

*Wirt,* in reply. 1. The construction attempted and insisted on by the counsel of the appellee, is, that there were two agreements—one between the ship owners and the appellee, and the other between them and the other shippers. There is a sealed instrument and an unsealed instrument, inconsistent with each other. Which is to give the law of the contract? Can an agreement under seal be revoked by an agreement not under seal? The authorities already cited on the part of the appellants are admitted; but it is said that this court decided the question on the former trial. That question was not before this court on the former appeal, as to the comparative dignity of the two instruments. General expressions found in a statute are to give way to the intention of the legislature. 1 *Blk. Com.* 87. *Com. on Cont.* 533. *Woods vs. Fulton & Stark,* 2 *Harr. & Gill,* 71.

2. If the court were not called on to expound the decrees of the foreign countries offered in evidence, then the jury were the judges of both the law and the fact. But the jury were not required to expound the decrees at all. The question put to the jury was, if they believed that agreeably to the decrees, the ports of the countries were closed as to uncertified colonial produce, and there was no certificate, &c. then *Wirgman* was

justified in going to *England.* The certificate was necessary for the safety of the cargo, but not for the vessel. The owner of the vessel could not know whence the cargo came; that was in the knowledge of the freighters. *Holt on Shipping,* 81. *Levy vs. Costerton.—Holt's Rep.* 170. The plaintiff was bound to prove that the certificate was on board of the vessel. He might have proved by the consul at *Baltimore,* that he had obtained the certificate required. How could *Wirgman* prove that it was not on board? He could not prove a negative. But it has been insisted, that it is to be presumed that all necessary papers were on board, and *Van Omeron vs. Dowick,* 2 *Campb.* 42, was relied on for that purpose. In that case it was the officer of the same country, and it was presumed he did his duty. It has nothing to do with the case now before this court. The case of *Tarleton vs. McGawley, Peakes N. P. Cas.* 205, is not applicable to the present question.

4. On the *fourth* bill of exceptions, he referred to *Drake vs. Hudson & Franciscus,* 7 *Harr. & Johns.* 399.

BUCHANAN, Ch. J. delivered the opinion of the Court.

This is an action of assumpsit brought to recover a sum of money retained by *Charles & Peter Wirgman,* who were the owners of the ship *William Wilson,* on account of freight, out of the proceeds of that part of the cargo, shipped on board that ship, which belonged to the appellee; and the question is, whether freight was earned or not.

Four bills of exceptions were taken at the trial. The appellee who was the plaintiff below, offered to prove, that the ports of *Constantinople* on the *Dardanelles,* of *Salonica* on the *Morea,* and of *Gibraltar,* all on the continent of *Europe,* were in the year 1810, open to *American* vessels loaded with colonial produce, an objection to the admissibility of which testimony, made on the part of the appellants, was overruled by the court. This forms the subject of the first bill of exception, and involves the construction of the contract, between the appellee and *Charles & Peter Wirgman.*

It is stipulated in the charter party, that the master shall proceed with the ship from *Baltimore* for the island of *Sylt* ; "and if, on arrival there, it can be ascertained that the ports of *Hamburg* and *Bremen* are open to the admission of *American* vessels, that the said master shall forthwith proceed to whichsoever the said ports, the supercargo and himself shall think most for the interest of the freighters. But should the said ports of *Hamburg* and *Bremen* continue closed, then the said cargo shall be landed at *Sylt* if permitted; and in case of refusal to permit the same to be landed at *Sylt,* that then the said master shall proceed therewith to such permitted port on the *North Sea* or the *Baltic,* as he and the supercargo shall order and direct. And should the *Baltic* be also closed against the admission of *American* vessels, in such case the said master shall proceed with the said cargo to such other port, as he and the said supercargo may in their discretion think most proper. And that on the arrival of the said ship at the port of delivery, the said master shall and will make a right and true discharge of the said cargo, to the supercargo, or to such other agent, factor or consignee of the freighters, as they may direct, agreeably to the bills of lading to be signed for the same, and so end and finish the said intended voyage, &c." and the freighters covenant to "pay freight for said cargo agreeably to bills of lading to be signed for the same, provided the said cargo be discharged at a port in the *North Sea ;* but if delivered at any port in the *Baltic,* not higher than *Kiel* or *Colberg,* then &c. to pay unto the owners an advance of &c. on the amount of freight money stipulated in the said bills of lading. If higher than *Kiel* or *Colberg,* and not higher than *Koningsburg,* a like advance of &c. and if higher than *Koningsburg* a like advance of &c., and should the *Baltic* be shut, a further advance to be settled by arbitration, &c."

This is not an action upon the charter party, and it is not perhaps necessary to inquire what would be the proper construction of that instrument if it stood alone. But taken together with the bill of lading, to which it refers, it seems very clear

that the permitted port contemplated, was a port in the *North Sea* or the *Baltic.*

One of the stipulations in the charter party is, that in case of a refusal to permit the cargo to be landed at *Sylt*, the master shall proceed therewith to such permitted port in the *North Sea* or the *Baltic*, as he and the supercargo shall order and direct. And another is, that on the arrival of the ship at the port of delivery, the master shall discharge the cargo, to the supercargo, or to such other agent, &c. of the freighters, as they may direct, agreeably to the bills of lading to be signed for the same, and so end and finish the said intended voyage, with a covenant by the freighters to pay freight agreeably to the bills of lading to be signed. And the bill of lading for the goods of the appellee, states the ship to be bound from *Baltimore* for *Sylt* and a permitted port in the *North Sea* or *Baltic*, and that the goods are to be delivered at such permitted port, unto *Messrs. David Parish & Co. Hamburg*, or their assigns, he or they paying freight, &c. at certain stipulated rates.

Here then is a charter party, in which the owners engage to deliver the cargo at a permitted port in the *North Sea*, or the *Baltic*, to the agent of the freighters, agreeably to the bills of lading to be signed, and so to end the intended voyage; and the freighters to pay freight agreeably to the bills of lading, with certain stipulated advances.

And a bill of lading of the goods of the appellee, in which, they are contracted to be delivered at a permitted port in the *North Sea*, or the *Baltic*, to *Messrs. Parish & Co. Hamburg*, or their assigns, at certain rates of freight therein mentioned.

So far then as concerns the goods of the appellee, it is a contract for the delivery of them at a permitted port in the *North Sea*, or the *Baltic*, to the *Messrs. Parish & Co. Hamburg*, or their assigns, at the rate of freight mentioned in the bill of lading, and the advances stipulated in the charter party, and the ending of the voyage by such a delivery of the goods at such permitted port. The charter party by the references to the bills of lading, in the provisions for *the delivery of the cargo* to the agent of the freighters, "agreeably to the bills of lading to be signed,"

and *the payment of freight* " agreeably to the bills of lading to
be signed," adopted, and made a part of it, the stipulation in the
bill of lading of the appellee's goods, for the delivery of them at
a permitted port in the *North Sea*, or the *Baltic*, to the *Messrs.
Parish & Co. Hamburg*, or to their assigns, and for the payment
of freight; and is the same, as if instead of referring to the
bills of lading, it had expressly stipulated, that the master should
deliver the goods of the appellee, at a permitted port in the
*North Sea*, or *Baltic*, unto *Messrs. David Parish & Co. Ham-
burg*, or to their assigns, for the freight mentioned, and so end
and finish the said intended voyage; that is, to end and finish
the voyage, as respected the interest of the appellee, by a
delivery of his goods to the *Messrs Parish & Co.* or their assigns,
at a permitted port in the *North Sea* or *Baltic*.

There were a number of persons interested in the cargo be-
sides the appellee; and the different provisions in the charter
party, with the engagement to deliver the cargo agreeably to
the bills of lading, (in the plural,) were probably introduced to
meet the views and interests of the several shippers, according
to the stipulations of their respective bills of lading, and what-
ever latitude may have been given in any of the other bills of
lading, that for the goods of the appellee, limited the contract in
relation to them to a port in the *North Sea*, or *Baltic*, and sure-
ly the parties were competent so to contract.

Then comes the memorandum or agreement of the 14th of
May, 1810, entered into by the owners, which is in these words:
"We hereby agree and acknowledge, that the sundry goods
shipped by you on board the ship *William Wilson*, *Peter Wirg-
man*, master, are to be landed in a permitted port on the conti-
nent of *Europe*, (meaning that they are not to be landed on the
Island of *Sylt*,) before the freight is earned. But should the
whole of the continent be shut, the freight with an addition, (as
arbitrators may determine,) will be earned, should the property
be landed in *England*, agreeable to the custom of the country."
And this agreement is supposed so to alter and control the voy-
age, as to extend the contract between the *Wirgmans* and the
appellee to any port on the continent of *Europe*.

This cause was once before in this court, on an appeal from the judgment of the *Baltimore* County Court, and on a reversal of that judgment, was sent back under a *procedendo*—and it is probable that, that court has been misled by the loose language of the opinion delivered on that appeal, and has supposed, that the contract of the parties was held by this court, to relate not merely to ports in the *North Sea* or the *Baltic*, but to any port on the continent of *Europe*, no matter where, or in what sea, as is now insisted upon here. And perhaps, looking to the opinion alone, that would be its construction; but it was certainly not so intended. Having delivered the opinion myself, I can speak confidently on the subject, and regret that it was not delivered in more guarded and restricted terms.

But the idea, that the contract looked for the destination of that part of the cargo at least, which belonged to the appellee, to any permitted port on the continent of *Europe*, other than a port on the *North Sea* or *Baltic*, was not suggested in the argument, which was particularly, and with great force, directed to the political state of affairs in *Europe*, in reference to what was commonly called the continental system, and the advanced and inclement season of the year, which it was contended forbid an attempt by the master to navigate the *Baltic ;* and with the danger of capture and detention by privateers, justified his proceeding to *Hull*, and there delivering the cargo. The whole course of the argument which was a very elaborate one, pointed to a state of things having no connexion with, or relation to, other ports on the continent of *Europe*, not in the *North Sea* or *Baltic*. The question whether the contract contemplated any other permitted port on the continent of *Europe*, than one in the *North Sea* or the *Baltic*, was not raised, nor thought of by the court, at least by myself; but looking only to those seas, and construing the engagements between the parties, with reference to the known state of affairs in *Europe*, as likely to operate upon the governments on the continent, having ports in those seas, and not the governments without the influence of that state of things, and having ports in other seas, the broad terms, *the whole of the ports on the continent of Europe*, to be found in the opinion

delivered, were too carelessly perhaps taken from the agreement, and were not meant to be used with reference to all the ports of the continent, no matter where or in what seas, as the ports intended by the contract, at some one of which the goods were to be delivered, before freight could be earned: but to the ports only on the continent of *Europe*, in the *North Sea* or the *Baltic*, according to the subject matter then in the view of the court. And that we think, is the only legitimate construction that can be given to the papers at that time, as now before us.

Looking to the historical facts and occurrences of the time, to which we may judicially look, and cannot well shut our eyes against them, it is manifest that, the voyage was undertaken, and the charter party, the bill of lading, and the agreement entered into, with a view to the political state of affairs in *Europe*, and should be construed with a view to that state of affairs; and so interpreted, it is not difficult to perceive, that the permitted port *on the continent of Europe*, in which the goods were, by the agreement to be landed before freight could be earned, was intended to be a permitted port in the *North Sea* or the *Baltic*; other ports on the continent of *Europe*, such as *Constantinople*, the ports in the *Morea* and *Gibraltar* not being affected by the system, the state of things, in the view of the parties, and the ports of the continent in the *North Sea* and the *Baltic* being alone within their influence.

The question is not what would be the correct construction of the agreement of the 14th of May, 1810, if it stood alone, without any index pointing to the intention of the parties, that could be properly looked to; or any thing in the context, to restrict the understanding of the general terms used, according to their plain and popular meaning, to a mere special and peculiar sense; but it is apparent that, that agreement relates to the voyage, contemplated by the charter party and bill of lading of the appellee's goods, and the acknowledgment that they are to be landed in a permitted port on the continent of *Europe*, before freight is earned, has reference to, and so far recognizes the contract arising from those instruments, and should therefore be

construed in connexion with them, and that contract, looking for the destination of the appellee's goods, to a permitted port in the *North Sea* or *Baltic*, the agreement speaking in relation to that contract, must be understood, by the terms "on the continent of *Europe*," to mean on the continent of *Europe*, in the *North Sea* or *Baltic*, and to have used those terms only for the purpose of showing, that the goods were to be landed on the *continent*, as distinguished from the *Island of Sylt*, and that interpretation is given to it, by the clause immediately following in the agreement itself, " *meaning that they are not to be landed on the Island of Sylt*," that is, that the terms " on the continent of *Europe*" mean *not on the Island of Sylt*, or denote, that they were not to be landed on the Island of *Sylt*, but on the continent only, before freight could be earned, and were used for that, and no other purpose. And the words in the last clause, " but should the whole of the continent be shut," have reference to what goes before, and must be construed to mean the continent, in the same restricted sense, in which it is before spoken of, that is, the whole of the continent of *Europe* on the *North Sea* and *Baltic*— and cannot mean any part of the continent, not contemplated in the preceding part of the agreement. Under this construction of the agreement, taken in connexion with the charter party and bill of lading to which it relates, the contract between the parties is, that the goods shipped by the appellee shall not be landed on the Island of *Sylt*, but at some permitted port on the continent of *Europe* in the *North Sea* or *Baltic*, before any freight shall be earned; but in the event of the whole of the ports on the continent of *Europe* in the *North Sea* and *Baltic* being shut, then, and not otherwise, the owners shall be entitled to freight on the goods being landed in *England*, with a stipulated addition.

The ports of *Constantinople*, on the *Dardanelles* of *Salonica*, in the *Morea*, and of *Gibraltar*, were not the permitted ports contemplated by the contract; proof therefore of their being open in the year 1810, to *American* vessels loaded with colonial produce, was irrelevant and inadmissible, and the testimony of *John Donnell* ought to have been rejected.

By the term *shut*, as used in the contract, is meant an occlusion by the municipal regulations of the country, and unless in that sense of the term, all the ports on the continent of *Europe* in the *North Sea* and *Baltic* were closed against the admission of the goods of the appellee, on board the ship *William Wilson*, the vessel could not earn freight by going to *England;* nor then, unless the instructions given by the appellee in his letter of the 8th of May, 1810, to *Peter Wirgman*, the master, were complied with.

It has been contended, that if agreeably to the orders and decrees of *France*, *Prussia*, *Russia*, *Sweden* and *Denmark*, all uncertificated colonial produce was prohibited from entry into any of the ports on the continent, in the *North Sea* or *Baltic.* It was incumbent on the appellee to have furnished the captain of the ship with a certificate of origin of that part of the cargo which belonged to him; and that if he neglected to do so, the captain fulfilled the contract of affreightment by proceeding to *Hull*, and there delivering the cargo. But we think otherwise, and that the want of such a document alone, was not sufficient to justify the captain in proceeding to *Hull*, and there delivering the appellee's goods. All parties were aware of the unsettled state of affairs in *Europe*, and the difficulties that would probably attend the landing of the cargo at any of the contemplated ports in the *North Sea* and *Baltic.* The charter party and bill of lading show it; the agreement and letters of instruction prove it. The goods were shipped, and the voyage undertaken, with the expectation of having risks and difficulties to encounter, and the contract and instructions were framed accordingly. The ship owners knew when they signed the agreement, which was subsequent to the bill of lading, that no certificate of origin was on board, and with that knowledge, and a knowledge of the character of the cargo, made their engagement with a view to the difficulties that might attend the landing of such a cargo, under such circumstances; and can no more avail themselves of the want of that document, because of the prohibition merely of uncertificated colonial produce, than they could have done of the fact, that the cargo consisted of co-

lonial produce, if the prohibition had been of all such produce, uncertificated or otherwise.   If in the latter case, they could not have sheltered themselves under the pretext alone, that the cargo consisted of colonial produce, and was therefore prohibited from entering any of the contemplated ports, having made their contract in relation to such a cargo; neither can they in this case, avail themselves of the circumstance alone, that the *appellee's part* of the cargo consisted of uncertificated colonial produce, and was therefore prohibited, having made their contract in relation to goods in that known predicament. The same reason would seem to apply in one case, as in the other; the prohibition in both being of the goods on board. In one, of goods without a certificate of origin; in the other, either with or without such a certificate, and there is no evidence in the cause to show that it was incumbent on the appellee to have provided such a paper, to enable him to resist the claim of the ship owners to freight, or that he was required to do so. The shipment was made on a calculation of chances, and the knowledge, advice and assistance of the *Messrs. Parish & Co. Hamburg*, were evidently much relied upon for the success of the enterprise.   And to obtain the benefit of their counsel and assistance, the appellee, in his letter of instructions to *Peter Wirgman*, the master, informs him, that he had requested them to consult with him on the further destination of the ship, and the disposal of his interest on board, in the event of an entry being denied at *Hamburg;* directing him to advise with them, as to what was best to be done for his interest; and constituting him his agent, if the state of affairs should be such as to prevent his communicating with them; in which case, he tells him to open his letter of instructions to them, to which he refers him for his government.   These instructions the master was bound to obey; it was his duty diligently to seek and to pursue the advice and directions of *Messrs. Parish & Co.* and if agreeably to the orders and decrees of the governments of *France, Prussia, Russia, Denmark* and *Sweden,* the goods of the appellee were prohibited from entering the ports on the continent of *Europe,* in the *North Sea* and *Baltic,* yet there might have been such

occasional suspensions of them, or relaxation in the enforcement of them, as to render the information and advice of *Messrs. Parish & Co.* of the first importance. And it would seem to have been in such a state of things, that the appellee wished to have the benefit of their superior intelligence and advice, and not when it could be had, to trust to the discretion of the master, who could not be so well informed. If there was a port on the continent of *Europe,* in the *North Sea* or *Baltic,* open to the admission of the appellee's goods, the master was bound to go there, before freight could be earned; it was the contract of the owners with the appellee, and he had a right to stand upon it. And the master could not entitle them to freight by going to *England,* and there delivering the goods, either contrary to, or without the advice of *Messrs. Parish & Co.* unless he was cut off from all communication with them by the unsettled state of affairs at the time. What then was the course pursued by the master? In his letter to *Messrs. Parish & Co.* of the 13th of July, 1810, he informed them of the capture of the ship by a *Danish* privateer, and that he was taken into a *Danish* port for adjudication; spoke of his having property on board belonging to the appellee, and asked advice and information, but said nothing of the consignment of the goods to them. That letter does not appear to have been received. In his letter of the 14th of September, 1810, he informed them, that he had craved their advice in his preceding letter, respecting *his future destination,* but added, that a more extensive knowledge of prize cases induced him to believe, that if he was in possession of it, it would be of no advantage. Thus virtually dispensing with any advice from them upon the subject; and upon that assumption he seems to have acted, as there is nothing to show, that he ever afterwards sought any advice or information from them in relation to the destination or disposition of the appellee's goods. In that letter he advised them, that a considerable part of the cargo was to their address, without saying to whom it belonged, or giving any account of the amount or character of the goods. On the 13th of October, 1810, he received an answer from them to his letter of the 14th of Sep-

tember, dated the 2d of October, and received in eleven days after it was written.   In this letter, they requested him to inform them, who were the shippers of the consignment to their address, and to forward any letters he might have for them, with any other information that might be useful, suggesting difficulties respecting the future destination of the ship, in the event of her being liberated, but that there was time enough to correspond on that subject, after being informed of the cargo on hand, and at the same time telling him, that several of their friends had proceeded from *Gottenburg* to *Carlsham*, there to unload their cargoes, &c.   On the 14th of October he acknowledged the receipt, on the preceding day, of that letter, informed them for the first time of the quantity and description of the goods to their address, and that they were shipped by the appellee, and that he was in daily expectation of his sentence, of which they might depend upon being immediately advised.   On the 30th of October they answered that letter; told him they were anxiously awaiting the result of the proceedings in the court of prize; referred him to the public papers for the late *French* and *Danish* decrees, and told him that under existing circumstances, it was difficult to point out a proper port of discharge, so many changes were taking place, but that if any further alterations should take place, they would keep him informed.   In his letter of the 8th of November, 1810, he advised them of the liberation of the vessel, and the restoration of his papers, on the 5th of the same month, by sentence of the prize court, and of his determination to discharge the cargo at *Flekkefiord*, where the ship was then lying.   Thus announcing his determination not to seek or await any instructions or advice from them, relative to the disposition of the cargo, but to act upon his own judgment.   And on the 10th of the same month, he acknowledged the receipt of their letter of the 30th of October, eleven days after it was written; and after regretting that it contained no information to induce him to alter his determination to unload at *Flekkefiord*, told them he intended to commence doing so on the Wednesday following—and afterwards without consulting them on the subject, or giving them any inti-

mation of his intention to do so, sailed for *Hull,* where he un-loaded the cargo.

Resting here, there is not a tittle of evidence to show a com-pliance by the master, with his instructions; but on the contra-ry, the whole of it has the opposite bearing. In his first letter to *Messrs. Parish & Co.,* he informs them of the capture of his ship; in his second he tells them, that his knowledge of prize cases, induces him to believe that their advice in relation to his future destination, would be of no advantage to him; and in his third, he for the first time, (and that only in compliance with their request, contained in their answer to his second letter,) discloses to them, the quantity and description of the goods to their address, and the name of the shipper—and although requested in the letter to which that is an answer, to forward to them any information that might be useful, and also told that it will be time enough to correspond on the subject of his future destina-tion, after they should be informed by him of the goods he had on hand, he neither communicates to them the nature of his in-structions, nor asks their advice. In his fourth, he announces to them the restoration of the ship and papers, and that no ap-peal was made, and also his determination to discharge the cargo at *Flekkefiord.* But it does not appear, that he forward-ed the letters of instruction to them, from the appellee with which he was entrusted, notwithstanding his saying, that the papers were restored to him on the 5th of November, and their request in their first letter, that he would forward any letters he might have for them; and in his last letter to them, he reiter-ates his determination to unload at *Flekkefiord,* and tells them that he intends commencing it on the Wednesday following, though they had before suggested to him, that some of their friends had proceeded from *Gottenburg* to *Carlsham,* there to unload their cargoes; and speaking of the frequent changes that were occurring, had promised in their letter of the 30th of October, to keep him informed of any changes that might take place in the state of affairs. And with a view to those frequent changes, that very unsettled state of affairs it was, that the shipment was made, and his instructions given him to

consult with, and be governed by the advice of the *Messrs. Parish & Co.* But having as early as the 14th of September, 1810, brought his mind to the conclusion, that the advice of *Messrs. Parish & Co.* would be of no service to him, and acting upon that assumption, he manifestly determined, not to throw himself upon them for information or instructions, but to take the disposition of the cargo upon himself. And he did do it, regardless of their suggestion, that some of their friends had proceeded from *Gottenburg* to *Carlsham*, to land their cargoes, their promise to keep him informed of any changes that might take place in the state of affairs, and their intimation of a correspondence to be opened, after they should be informed by him of the goods on hand, all which was before the vessel had been liberated; his advice of which event was accompanied by the information, that he had determined to discharge the cargo at *Flekkefiord*, and followed two days after by the information, that he should begin unloading the Wednesday following, without asking any advice or information on the subject, which, added to his having withheld a disclosure of his own instructions, and neglected to forward the letters of instruction to them from the appellee, and thus kept them in a state of ignorance that he was placed under their direction, was calculated to induce the belief, that he was acting by authority, seeing that he withheld himself from all further communication with them, and sufficiently accounts for their not writing to him again, in the absence of proof of any other cause.

If at the time of the liberation of the *William Wilson*, all the ports of the continent of *Europe* on the *North Sea* and *Baltic*, were, in fact, closed by municipal regulations, against the admission of a vessel and cargo in her predicament, and she was expelled from the ports of *Norway*, by the orders of the *Danish* government, so suddenly after her liberation, as not to allow time for a further correspondence between the master and *Messrs. Parish & Co.*, and he was prevented from communicating with them, by the situation of affairs, and not by his own act or conduct; he would, under such circumstances, to be found by the jury, and by force of his letter of instructions, have

become the special agent of the appellee, and by proceeding to *Hull*, in *England*, and there accepting that part of the cargo which belonged to the appellee in fulfilment of the contract, have entitled the owners to freight, and the court should have so instructed the jury, if there had been any evidence in the cause to justify such a direction. But we can discover no such evidence.

If it should be conceded that, that part of the deposition of *James Dooley* relied upon for that purpose, was legal evidence, which is not very clear, being only evidence of what he heard a pilot say, there is nothing in it to sustain such a direction. The most that can be made of *Dooley's* testimony is, that about the 10th of December, 1810, the master went on board the ship accompanied by a pilot, who directed her to be got under way, and said he had received orders from a custom house officer to take her to sea that night. Now there is nothing in this, tending in the slightest manner to prove, that the ship was expelled from the port of *Norway* by the orders of the *Danish* government so suddenly after her liberation, as not to allow time for a further correspondence between the master and *Messrs. Parish & Co.*, and that he was prevented from communicating with them by the situation of affairs, and not by his own act or conduct. The ship was liberated, as is shewn by the letter of the master himself, of the 8th of November, 1810, on the 5th of that month, and according to *Dooley's* deposition, was taken to sea by the pilot about the 10th of *December*, thirty-five days after her liberation; during the whole of which time, she was permitted by the state of affairs, to remain at *Flekkefiord*. It is also shewn by the letters of the master, that in answer to letters addressed by him to *Messrs. Parish & Co.*, after the capture and during the detention of the ship, he received two letters from them, in eleven days after their respective dates. *Dooley's* testimony then, so far from tending to prove, or affording the slightest ground for the inference, that the ship was expelled from the ports of *Norway* so suddenly, as not to allow time for a further correspondence between the master and *Messrs. Parish & Co.* if it proves any thing, clearly establishes the contrary hypothesis, by shewing that she was

permitted to remain at *Flekkefiord* thirty-five days after her liberation; quite long enough for a communication with *Messrs. Parish & Co.*, as it only required eleven days for a letter to pass between them—during which time, the master, if he had been so disposed, might, as it was his duty to do, have opened a correspondence with them, relative to the disposition or further destination of the appellee's goods. And so far from there being any evidence to show, that his not seeking the advice of *Messrs. Parish & Co.*, was owing to the situation of affairs, which prevented his communicating with them, the whole of the evidence lies the other way. His telling them in his second letter, that their advice would be of no service to him, and never afterwards seeking it; and his following up that with his letters of the 8th and 10th of November, in the first of which he advises them of the liberation of the ship, and his determination to land the cargo at *Flekkefiord*, and in the other, of his intention to commence unloading on the Wednesday following; and the evidence of *Dooley*, that in the month of *October* or *November*, before the vessel was released, he heard him and *Thomman*, the supercargo employed by the other shippers, say, that they had united in the determination to proceed to *Hull* in the event of the liberation of the ship, with the additional circumstance, that he made no effort to obtain their advice, during the thirty-five days that the ship was permitted to remain at *Flekkefiord* after her liberation, tend strongly to prove his fixed determination, not to submit himself to their directions, but to act upon his own judgment and responsibility. The hypothetical direction, therefore, which was asked for by the prayer set out in the fourth bill of exceptions, was properly refused, being an abstract proposition, not arising out of the evidence in the cause.

Whether the ship owners were, under the circumstances of the case, entitled in equity and good conscience, to retain the money received on account of freight, was clearly a question not to be left to the jury, but proper only to be decided by the court.

We concur, in opinion, with the court below, on the second, third and fourth bills of exception, but dissent from the opinion expressed in the first exception, and REVERSE THE JUDGMENT AND AWARD A PROCENDO.